Good morning, Your Honors. My name is Howard Davis. I represent Petitioner Valerik Avedian. I'd like to keep about two minutes for possible rebuttal time. All right. First of all, there are a number of issues here, but with regard to the asylum, definitely substantial evidence does not support the conclusion that the petitioner lacks a well-founded fear. In fact, an opposite conclusion is compelled. The judge found the petitioner to be credible. All the documentary evidence was admitted into the record. So if that is the case, and taking the Ninth Circuit's analysis of the inverse relationship between the individualized targeting and the targeting of a particular group, then what we have is the following, is that the petitioner clearly has an individualized risk of being persecuted upon a return to Iran. One of the things that came into the record is that she's on a blacklist at the airport. How solid is that evidence? Well, if you take a look at what's in the both in the supplemental in the supplemental affidavit and the accumulation of the supplemental affidavit and her testimony, that is that the petitioner learned from a close friend of her brother who works at Swiss Air Cargo at the at the airport that she's on a blacklist. The judge did not make any adverse credibility, so that has to be taken in. And it was certainly detailed enough to the extent possible that she's on a blacklist, and it's from someone who works at the airport and had connection with the Pasteran, the Revolutionary Guards. What's the effect of that, being on the blacklist? The thing is, is that they're clearly interested in her because she also received a letter to come to have a conversation with the local Revolutionary Neighborhood Group. And first of all, the record is very clear about the human rights abuses that people coming back from the United States are subject to a lot of questioning. And that persecution means subject to questioning? Pardon me? But the question is, what could happen after? Is that she is definitely subject to being placed in prison. Given the fact that she's an Armenian, she's been in the United States for a long time, and that her ties to the United States are known, and that she's a Christian, all of them, and the reports talk about the greater harassment of people who are ethnic and religious minorities. So the difficulty I have with your argument is harassment is not persecution. Persecution is an extreme concept. So the fear of persecution would have to be of something extreme, not harassment, not questioning, not blacklisting. Well, but the thing is what happens is that it's clear that she should be taken into prison. I mean, that is what's in the record as to what happens with such individuals. How is that in the record, that individuals who return from America are routinely imprisoned? Well, it's what happens when they are taken into, when they are questioned by people connected with the government. It is, the Revolutionary Guards are definitely not respecters of human rights. And so it's the risk of being taken into prison and having the problems connected with being in prison there. Counsel, what case authority are you relying upon to support your argument that the risk of being in prison equates to a fear of persecution? Well, no, but the, Your Honor, is the... Could you just give me the case that you're relying upon? OK. There is, if I may cite to a case that was not cited in the brief, here's Hoxha versus Ashcroft at 319 Fed 3rd, 1179, in which the court found that in that case, the petitioner Hoxha was summoned to have an informative conversation with Serbian authorities. And the court found that that would be a, that that person definitely had a personalized risk of being harmed. It's the issue is that if we're looking at the asylum standard, which is at least a 10 percent chance, if you just take a look at what's in the record and year after year after year, the State Department reports have been talking about the poor human rights records of this country, of Iran. Another thing that I want to cite to, and that I did give a copy of this to Respondents' Counsel, is a BIA case which has come out in the last year called Matter of G.A. Counsel, it's very difficult for us to prepare for oral argument.  I could I could give that as a gum sheet after the hearing. So I mean, it's so you have this plus the the the the cumulate the accumulation of of but of also the possibility of having extreme economic discrimination. The fact that your client worked for the at least an affiliate of the United States information is important. Is it the fact that your client worked for an affiliate of the USIA? Well, I would say that it is it it is important because of the anti-American animus in that country. How do you explain that? She lived there after the 1979 revolution, the takeover of our embassy there for for 10 years, essentially. But her particular fear comes also after she left the United States. It's when it's after she left Iran that she received a summons to come into the neighborhood. It's it's after she left Iran that she found out she was on the blacklist. So it is it is true that she did have she was called in for questioning before she left and around the time that she was working. And then after that, as she did not have a she had a period of not being disturbed. But it's after she left that she has the concerns. What's your response to the government's position that moderates are now in control? But if that is but then that is belied by the that is also belied by the record where in the in the reports that were submitted in the with the with the appeal that showed that the conservatives still have power. So that was something that the judge kind of hinged his decision on was the fact that moderates came in. But but it's clear in the in the in later reports that were submitted into the record on appeal that that the conservatives still hold a lot of power. So based on that, she definitely meets at least the 10 percent chance for a well-founded fear. How did you want to say it's in time for rebuttal? Yes. I also wanted to address the due process, but I do. And they will bring that up on. Good morning. May it please the court. Joan Smiley here on behalf of the attorney general. With respect to the asylum claim, the only issue, of course, is whether there's a well-founded fear of persecution. The petitioner conceded that there's no past persecution claim. And when we look at what is her claim grounded upon, there are actually two things, a respectful letter, respectful in her characterization that she received from the Revolutionary Committee. Actually, it was sent to her home in Iran in October 1990, almost 15 years ago, asking her to appear. The letter did not specify what the circumstances were. Petitioner testified she's never heard anything more about that letter. She doesn't have a copy of it because she never asked her tenant who received it to forward it to her. The second issue that her claim is grounded upon is that in 1994, her brother told her that a friend of his who works at the airport in Iran said that she's on a, quote, blacklist. Now, as Judge Rawlinson pointed out, Your Honor, you asked what effect is there of being on this blacklist? That's something that the immigration judge pointed out when he was considering that aspect of the case. In fact, there was no specific evidence concerning the nature of the list, why she might be on the list, what happens to people on the list if there is a list. Petitioner's claim is that these two incidents, in essence, form a well-founded fear of persecution. Because of her family's connections to the American government, she worked for the Iran America Society. And Judge Hanson, in response to your question, how important is it, we would point out she ceased working for them 23 years ago. So the import of that employment is questionable at best. She claimed that her family also worked for the American government and the embassy. She didn't just claim it, that's true, isn't it? Excuse me? She didn't just claim it, it's true, isn't it? Yes, but she's claiming that her asylum claim is grounded in part upon that employment. Well, counsel, our president has told us that Iran is part of the axis of evil. And the country reports are all very negative as to the human rights that are violated. So I think that we should give some credence to her fear that her American connections would be used against her if she were to be returned. Wouldn't you agree with that? Not necessarily. The 2000 State Department report that is in the record undercuts her claim in that regard. It indicates that there are some reforms that have taken place. The parliamentary election that was held in February 2000 brought in reformers that now hold two-thirds of the 290 seats. But we read in the press constantly that the reformers are not really having an opportunity to reform because of what is happening there. And right now our relations with Iran are about as bad as they could be. Is that not right? Well, I would agree that Iran probably the conditions there demonstrate general conditions of violence. The State Department reports do not constitute a ground for a claim of asylum unless there are particular circumstances in which the individual will be singled out for harm. Well, she tells us that having had close connections to the Americans and really working for an American agency for many, many years, and the fact that she's a Christian, are those special circumstances. The State Department reports also indicate that the Armenian Christians are able to hold jobs, secure wealth. There's no indication that there's any persecution on that basis that would occur. Is the State Department currently advising American citizens to travel to Iran? There was a travel advisory indicating that U.S. citizens should be warned against it. But however, the petitioner is not a U.S. citizen, and I'm not sure that what effect the travel advisory would have on her. The point is there are many countries in the world where conditions are less than desirable. You indicated that in her own language she had described the summons to appear before the local revolutionary committee as respectful. I suppose that in 1936, a respectful Gestapo commander could have sent a respectful letter to the local Jews inviting them in for a conversation as well. Do you agree with that? I would have no basis to agree or disagree with that, but the point is — Well, does the tone of the letter make any difference? Well, the point that — excuse me — that I was making is that the letter that she received does not indicate — excuse me, the letter that was sent to her house does not indicate that there was any threat being made. She turned it respectful in that it was simply asking her to come in to the office. There's nothing in the record to indicate, you know, whether there's something untoward about the letter or her requested appearance or not. What could possibly be the motive for the revolutionaries to ask her to come in? If they did ask her to come in. Again, we don't have that — What possibly could be their motive? We would be speculating if we tried to come up with what could it be. Could it be something that she was involved in in Iran that had nothing to do with this? Maybe, maybe not. Could it have been because they knew that she had worked for the Iran America Society? Maybe, maybe not. It's pure speculation because there's nothing in the record that would indicate what — if the letter does exist, exactly what is the import of it and why she was called in. Counsel, one of the assertions that the petitioner makes is that the BIA disregarded the motion to remand. Do you agree with that? Absolutely not. The board did not abuse its discretion in that regard because the board treated the motion as part of the appeal, which is exactly what petitioner asked them to do. They filed a motion — excuse me, their brief in support of appeal, or alternatively, they asked for remand. They submitted the two State Department reports, the 2000 country report and the travel advisory, and they asked the board to either remand or alternatively to consider these documents in the context of the appeal. In its decision, the board noted that it had considered petitioner's brief and even commented that it had been a well-reasoned brief. Therefore, there's no indication that the board abused its discretion in any way. Petitioner has not shown that the documents are material and would likely change the result. Therefore, the board found no reason to remand the cases, the implication, but it did consider the brief and the information in the context of the appeal, which is the alternative that petitioner asked for herself. And could you briefly address the due process assertion? Yes, Your Honor. We would submit that because there's no liberty or property interest at stake, the issue really should be whether the immigration judge's denial of the motion to reset the hearing date was an abuse of discretion. And as the court is aware, there are many cases in this circuit and others which hold that the immigration judge's denial of a continuance or here it's to reset the hearing is within the judge's discretion. Does it make any difference, counsel, that in this case the immigration judge invited her to withdraw her asylum claim and to go for adjustment of status? Suspension. Well, the judge asked her counsel if this was her intention, and he said, I guess so, or something to that effect. Well, that's kind of an invitation, is it not? Well, it's a question. Oftentimes in the hearings, the judge tries to sort of get a sense of where the case is heading and asks, do you intend to hire a lawyer, do you intend to seek asylum? It's to, I think, schedule and to ascertain the direction of the case. As applicants become eligible for additional opportunities in these proceedings or avenues of relief cease to exist, I don't think it's fair to expect the immigration judge always to disrupt the heavy flow of hearings each time a schedule change is sought. We see time and time again in Ninth Circuit case law where aliens become eligible for relief maybe years after the order to show cause or the notice to appear is issued. And, you know, five years later or so, they're, you know, they may come in and say, well, look, now I have this equity that I would like the board to consider. Well, you're asking us to send a woman who's been living here for 17 years and 64 years of age and been of service to the United States back. That's what the government wants, I guess. Your Honor, we are charged with following the statute that Congress has enacted. And it's not up to us to look at the facts of a case and say, oh, well, maybe this is more sympathetic than this case because the person is this age or worked in this place 23 years ago. The statute is clear on its face, and we are simply here. The immigration judge on the board was doing their best to comply with the mandate that Congress has enacted. The consequence of not granting her motion to advance her case on the calendar was that the stop time rule of the new statute was applied to her and the extended time from seven to 10 years would be applied to her. Is that correct? Yes. Well, I'm sorry. Could you repeat the question? Let me ask you what was the consequence to Ms. Vidian of not advancing her case on the calendar as she requested? Well, the consequence would be that by the time it came up for hearing, she would not be eligible for suspension of deportation. That's correct. But she was very near the seven years, right? Yes, she was. But, again, you know, we have many cases where someone is in deportation or removal proceedings and then meets a U.S. citizen, decides to get married. That citizen petitions for adjustment of status that the alien is seeking, and it could be another year or two before a petition is approved. So, again, I think we have to look at whether the immigration judge abused his discretion, and it's clearly under the case law of the circuit. It's within his discretion to grant continuances. Is it reasonable inference that his petting denied exclamation point on her application to advance on the calendar? Is it reasonable inference there that that really says gotcha? Oh, I wouldn't agree with that, no. You know, it does say denied with an exclamation point. However, the proceedings had been the order to show cause was issued in March 96. The petitioner had five hearings by this time. She's had five hearings between 1996 and 2000. She apparently has had all the process that is due. They were full and fair hearings. I don't know what was in the immigration judge's mind, you know, why he framed the order that way, but the fact is the immigration judge has the discretion to control the calendar, to grant continuances, to deny continuances, and clearly under the facts of this case the action he took was well within that discretion. All right, Counsel. Thank you very much. You have exceeded your time. Thank you, Your Honor. Getting to the due process issue here, in fact, if I may cite to the court here an old case, Bayeris, B-A-I-R-E-S versus I-N-S, 856, Fed Second, 89. Is that in your brief? No, it's not, Your Honor. And I will submit this on a gum sheet after, at page 91, where it has to do with motions for continuance. And there's really no difference between a motion for continuance and a motion to advance. It's all about changing the calendar. And while it is true, it cites that the regs for continuances, judge may grant a motion for continuance for good cause shown. And the Court said, but we have also observed that the judge's discretion is limited. And the Court has to take a look on a case-by-case basis as to whether or not to grant a continuance. None of this was exhibited in the judge's terse, denied exclamation point. And it's precisely in not according that, making that, that the judge denied due process. And, again, due process is, it's the right, it's the opportunity to be heard at a meaningful time, a meaningful time and in a meaningful manner under Matthews versus Eldridge. And this is what was denied. The April 31st, I mean, March 31st at midnight was the cutoff point. And she never had that opportunity to even do that. And then just one other thing. In the administrative record at page 47 on the travel warning, it says, although the Petitioner is not a U.S. citizen, but even U.S. citizens of Iranian origin are considered to be by Iran to be Iranian citizens and they have been detained. And it's precisely in the detention that the Petitioner is gravely afraid. And the report's back to her. Thank you. Thank you. Thank you to both counsel. The case just argued is submitted for a decision by the court. The next case on calendar for argument is Nazi versus Ashcroft.
judges: Fletcher Hansen, Rawlinson